IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No.  05-cv-01296-WYD-MJW

PUEBLO COUNTRY CLUB,

    Plaintiff(s),

v.

AXA CORPORATE SOLUTIONS INSURANCE COMPANY, f/k/a GLOBAL RISKS US INSURANCE COMPANY,

    Defendant(s).

---

**ORDER**

---

I.      INTRODUCTION AND BACKGROUND

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment, filed August 1, 2006 (docket #47).

This is a breach of contract and bad faith insurance case arising out of Defendant's alleged failure to settle a lawsuit within policy limits.  Several facts are not in dispute.  During all times relevant, Plaintiff Pueblo Country Club ("PCC") was insured by Defendant AXA Corporate Solutions Insurance Company ("AXA") under a Directors and Officers Liability Including Organization Reimbursement Policy (the "Policy").  The policy provided a $1,000,000 liability limit in the aggregate, and covered "damages, settlements, and Costs, Charges and Expenses," but did not cover "punitive or exemplary damages."  Policy at 1 Item C, 14 § II.F.  Under the Policy, "Costs, Charges and Expenses" included "reasonable and necessary legal fees and expenses incurred

by the Directors and Officers in defense of any Claim and appeals therefrom . . . ." Policy at 15 §§ II.G.  In other words, the Policy was an eroding limits policy in that any amounts paid as "Costs, Charges and Expenses" would reduce the total liability limit available to pay damages or settlements of a claim.

On January 11, 2000, Arcenio Garcia filed a lawsuit against PCC alleging that PCC unlawfully terminated him from his position as a golf course Grounds Maintenance Superintendent based on his race, national origin and age (the "Garcia Suit").  Garcia asserted claims under 42 U.S.C. § 1981 and 29 U.S.C. § 621 (the Age Discrimination in Employment Act, hereafter "ADEA") and sought to recover compensatory and punitive damages.  PCC selected and retained attorney John Keilbach ("Keilbach") to represent it in the Garcia Suit.  AXA also retained counsel to represent its interests with respect to the Garcia Suit.  On February 9, 2000, AXA sent PCC a letter evaluating coverage under the policy, and advising that the Policy excluded losses arising out of emotional distress as well as punitive damages.  Def.'s Ex. A-11.  The letter further advised that the Policy required PCC to obtain AXA's consent before agreeing to any settlement, "particularly if the Club seeks reimbursement for any portion of the settlement amount." *Id.*

On December 19, 2000, Keilbach received a letter from Garcia's attorney stating that he was authorized to settle the case for $850,000.  On February 23, 2001, PCC filed a motion for summary judgment in the Garcia Suit.  The motion was granted in favor of PCC on all of Garcia's claims.  Garcia subsequently filed an appeal with the Tenth Circuit Court of Appeals, and on August 21, 2000, the Tenth Circuit reversed the

district court's grant of summary judgment and remanded the case for further proceedings. Following remand, counsel for PCC and AXA discussed settlement value of the Garcia Suit. In a letter dated September 27, 2002, AXA's counsel recommended that AXA consent to settlement of the Garcia Suit for up to $400,000, but recommended that AXA require PCC to contribute "at least 20% of any settlement amount." Def.'s Ex A-23. In the letter, AXA reiterated that in addition to actual damages, Garcia sought punitive damage, emotion distress damages and attorney fees, which were not covered under the Policy. As to defense costs already incurred, AXA stated that "the Policy provides the Insurer with the sole discretion to advance defense costs prior to final disposition of the Claim, with the understanding that if it is ultimately established that there is no coverage for this Claim, the Insured will be required to repay all defense costs advanced pursuant to Section V.B.(1) of the Policy." AXA recommended allocation of defense costs up to 80% of the defense fees incurred to date and on a going forward basis "with the Insured to be responsible for the remaining percentage due to the emotional distress aspect of this case." PCC and AXA then entered into a series of interim fee agreements pursuant to which AXA reimbursed PCC for 80% of the defense costs incurred.

On October 3, 2002, PCC sent a letter to Garcia's counsel inquiring as to whether Garcia was interested in engaging in mediation. Garcia declined the invitation to participate in mediation, and made a "policy limit demand" of $1,000,000.00 to settle the case. On November 8, 2002, PCC, with the consent of AXA, offered Garcia $250,000 to settle his claims. Garcia did not respond to this offer. However, on

November 15, 2002, the district court ordered PCC and Garcia to engage in a settlement conference before Magistrate Judge Schlatter.  The settlement conference occurred on December 2, 2002 and both PCC's and AXA's counsel attended the conference.  During the course of the settlement conference, PCC offered Garcia $325,000, which he rejected.  On February 13, 2003, AXA's counsel provided PCC with consent to make an offer of judgment in the amount of $350,000, but Garcia did not respond to the offer.  Prior to trial AXA's authorized an offer of $425,000, which Garcia also rejected.  The case proceeded to trial and on November 26, 2003, the jury returned a verdict in favor of Garcia on his Age Discrimination Claim, and awarded Garcia compensatory damages in the amount of $417,923, consisting of $256,362 in lost back-pay and $161,561 in lost front pay.  *See* Special Verdict Form.  In addition, the Jury found that "defendant Pueblo Country Club's conduct in connection with plaintiff's termination was willful."  In the Judgment, the district court awarded Garcia "liquidated damages"under the ADEA in the amount of $256,362, ordered that PCC pay Garcia a "tax enhancement award" in the amount of $167,781, and awarded Garcia attorney's fees in the amount of $672,000.  The final judgment entered against PCC equaled $1,514,066, not including pre or post-judgment interest and costs.

Following the district court's entry of final judgment, PCC and Garcia entered into a settlement agreement under which PCC agreed to pay $1,500,00 in satisfaction of the judgment.  By the time the parties negotiated the settlement agreement, AXA had advanced PCC a total of $313,811.65 in defense costs.  To effectuate settlement, AXA contributed the remaining $686,188.35 of the Policy's liability limit towards the

settlement and PCC paid the remaining $813,811.65.

In the instant case, PCC brings claims against AXA for breach of contract and bad faith breach of contract based on allegations that AXA refused numerous requests by PCC to settle the Garcia Suit within the Policy's limits, controlled defense of the Garcia Suit in a manner that prevented settlement and caused defense costs to be spent, failed to offer its Policy limits to settle the case prior to judgment, and placed its interest above the interests of its insured.  AXA has asserted a counterclaim against PCC to recover the $1,000,000 paid on PCC's behalf because, "under Colorado public policy, PCC is not entitled to insurance coverage for damages caused by its intentional or willful wrongful conduct."

II.     ANALYSIS

    A.     Summary Judgment Standard

In considering a motion for summary judgment, the Court is mindful that "summary judgment is a drastic remedy" and should be awarded with care.  *Conaway v. Smith*, 853 F.2d 789, 792 n.4 (10th Cir. 1988).  Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining whether a movant has satisfied the burden imposed by Rule 56, all factual disputes and inferences must be drawn in favor of the nonmoving party.  *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980).

### B. Whether Summary Judgment is Proper in this Case

#### 1. Colorado Public Policy

I first address AXA's contention that it is entitled to summary judgment on both Plaintiff's claims for breach of contract and bad faith, and on its counterclaim for reimbursement because "under Colorado public policy, PCC cannot obtain insurance for coverage for loss caused by PCC's own intentional age discrimination against Garcia." Def.'s mtn at 4.

In the Garcia Suit, the jury was instructed that in order to find in favor of Garcia on his age discrimination claim, they must find that PCC "intentionally and purposefully discriminated against [Garcia] because of . . . age." Indeed, in the special verdict form, the jury found that Garcia proved his age discrimination claim, and further found that PCC's "conduct in connection with [Garcia's] termination was willful." In the instant motion, AXA seeks a determination that ADEA claims are uninsurable as a matter of Colorado's public policy. It is AXA's position that because Colorado's public policy precludes coverage for damages arising from the Garcia Suit, PCC's bad faith and breach of contract claims fail as a matter of law, and it is entitled to reimbursement of all monies paid to PCC in connection with the Garcia Suit.

Colorado generally recognizes a public policy against insuring intentional or willful wrongful acts. *Bohrer v. Church Mut. Ins. Co.*, 965 P.2d 1258, 1262 (Colo. 1998). In addition, Colorado's public policy prohibits an insurance carrier from providing insurance coverage for punitive damages. *Lira v. Shelter Ins. Co.*, 913 P.2d 514, 518 (1996). However, the issue of whether Colorado pubic policy precludes an

insurance carrier from providing coverage for an insured's intentional wrongful discrimination has not been addressed by any Colorado courts. A federal district court sitting in diversity must apply the law of the forum state, as announced by that state's highest court, *Blanke v. Alexander*, 152 F.3d 1224, 1228 (10th Cir. 1998) (citations omitted). "In the absence 'of an authoritative pronouncement from the state's highest court,' a federal court should regard itself 'as sitting in diversity and predicting how the state's highest court would rule.'" *Postal Instant Press v. Jackson*, 658 F.Supp. 739, 746 (D. Colo. 1987). However, federal courts are "reticent to expand state law without clear guidance from [a state's] highest court." *Taylor v. Phelan*, 9 F.3d 882, 887 (10th Cir. 1993); *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000) (it is not the place of federal courts to expand state law beyond the bounds set by the state courts). Here, AXA acknowledges the absence of Colorado state law on point, but notes that courts in other States have held that the public policy of those states prohibits insurance coverage for intentional discrimination. For example, in *Ranger Ins. Co. v. Bal Harbour Club*, 549 So.2d 1005, 1009 (Fla. 1989), the Supreme Court of Florida held that "the public policy of Florida prohibits an insured from being indemnified for a loss resulting from an intentional act of religious discrimination." *See also Groshong v. Mut of Enumclaw Ins. Co.*, 923 P.2d 1280, 1285 (Or. App. 1996) (public policy precludes insurance coverage of claims alleging 'disparate treatment' discrimination); *B&E Convalescent Ctr. v. State Comp. Ins. Fund*, 8 Cal.Rptr.4th 78, 98-99 (Cal. App. 1992) (statute precluding coverage for "willful acts" interpreted to include termination in violation of state anti-discrimination statutes).

However, other States have reached the opposite conclusion. In *Independent Sch. Dist. No. 697 v. St. Paul Fire & Marine Ins. Co.*, 515 N.W.2d 576 (Minn. 1994), the Supreme Court of Minnesota concluded that Minnesota's public policy did not void a school administration liability policy providing coverage for claims alleging intentional age discrimination. In reaching this conclusion, the court reasoned that it did not believe its holding would encourage the insured school district to discriminate against its employees. *Independent Sch. Dist.* at 580; *see also New Madrid County Reorganized School Dist.*, 904 F.2d 1236, 1242 (8th Cir. 1990) (refusing to expand Missouri public policy to prohibit insurance coverage for civil rights violations); *Sch. Dist. For City of Royal Oak v. Continental Cas. Co.*, 912 F.2d 844, 849 (6th Cir. 1990) (Michigan's public policy did not void coverage for religious discrimination).

One of the primary reasons for a policy against insuring intentional or willful acts is a concern that such coverage extends to the insured "a license to commit harmful, wanton, or malicious acts." *American Family Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 957 (Colo. 1991). I am not convinced that allowing employers to obtain insurance coverage for ADEA claims would encourage or stimulate intentional discriminatory conduct. Nor am I convinced, in light of the split of authority from other jurisdictions, that Colorado's Supreme Court would expand its public policy to prohibit insurance coverage for civil rights violations. Under these circumstances, I am not inclined to expand Colorado's general public policy against coverage for intentional or wrongful acts to void coverage for the age discrimination claim asserted against PCC in the Garcia Suit. Therefore, I find that Colorado's public policy does not bar coverage in

this case.

In addition, I note that Colorado law provides that an insurer must raise or reserve all defenses known to it within a reasonable time or those defenses may be waived or the insurer may be estopped from asserting them. *United States Fidelity & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 210 n. 3 (Colo. 1992); *Commercial Union Ins. Co. v. Roxborough Village Joint Venture*, 944 F.Supp. 827, 834 (D. Colo. 1996). Following entry of Judgment in the Garcia Suit, and with full knowledge of the jury's findings, AXA agreed to pay approximately $686,188.35 towards settlement of the case. The monies AXA advanced to effectuate settlement of the Garcia Suit were made with full knowledge of any defenses AXA had to coverage, including the public policy argument it raises here. In addition, the record contains no evidence that AXA requested reimbursement of the monies it advanced to PCC for defense costs following entry of Judgment in the Garcia Suit. AXA has not presented any Colorado authorities which would entitle it to reimbursement under the facts of this case. In light of AXA's voluntary decision to pay its remaining policy limits, I find that AXA waived its right to assert a counter-claim for reimbursement in this case, and its motion for summary judgment on its counter-claim is denied. *United States Fidelity*, 842 P.2d at 210 n. 3; *see generally National Union Fire Ins. Co. Of Pittsburgh, Pa. v. Emhart Corp.*, 11 F.3d 1524, 1533 (10th Cir. 1993).

  2. <u>Reasonableness of AXA's Conduct With Regard to Settlement</u>

I next address AXA's assertion that it is entitled to summary judgment because PCC cannot establish that it unreasonably withheld consent to settlement.

During the course of the Garcia Suit, Garcia made two offers of settlement. Garcia made the first offer for $850,000 prior to PCC's filing of its summary judgment motion, and made a second offer for $1,000,000 following remand from the Tenth Circuit. It is AXA's position that because PCC never requested AXA consent to settlement for $850,000, AXA never breached any duty it owed PCC under the Policy. AXA further contends that following remand, PCC never presented AXA with any settlement opportunity that could have been met within the available liability limits. AXA further contends that it is undisputed that it relied on the advice of counsel in determining the amount of settlement authority to grant in the Garcia Suit, and that PCC cannot demonstrate that AXA knew or recklessly disregarded the fact that its conduct was unreasonable, as required by *Travelers Ins. Co. v. Savio*, 706 P.2d 1258 (Colo. 1985).

As an initial matter, I reject AXA's contention that *Savio* sets forth the applicable standard of conduct in this case. *Savio* was a first-party direct coverage case in which an insured employee brought suit against his employer's workers' compensation insurer for negligent conduct in the processing of his claims for workers' compensation benefits. In that case, the Colorado Supreme Court concluded that in a direct or first-party context, an insured must prove that its insurer's conduct was unreasonable and that the insured knew or recklessly disregarded the fact that its conduct was unreasonable. *Savio*, 706 P.2d at 1274-76.

However, this is a third-party bad faith case in which PCC contends that AXA acted unreasonably in its failure to settle the claims asserted against PCC in the Garcia

Suit. *Goodson v. American Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 414 (Colo. 2004); *see also Farmers Group, Inc. v. Trimble*, 691 P.2d 1138, 1141 (Colo. 1984). In this case, the Policy required PCC to obtain AXA's consent before agreeing to any settlement of the claims asserted against it in the Garcia Suit. In the third-party content, "an insurance company stands in a position of trust with regard to its insured; a quasi-fiduciary relationship exits between the insurer and the insured." *Goodson*, 89 P.3d at 414-15. Because of this quasi-fiduciary relationship, the conduct required of the insurer is characterized by negligence principles. *Id.* at 15. To establish the tort of bad faith in this context, the insured must show that "a reasonable insurer under the circumstances would have paid or otherwise settled the third-party claim." *Id.*

    I find that there are numerous material facts in dispute concerning whether AXA's conduct with regard to settlement of the Garcia Suit was reasonable. Here, PCC has presented evidence, including e-mail correspondence between PCC's counsel and AXA and the deposition testimony of Cari Jay Raymond, that AXA exercised significant control over defense of the Garcia Suit, and controlled settlement in all material respects. In addition, PCC has presented evidence, through the deposition testimony and report prepared by Plaintiff's expert Lewis Quigg, Esq., following remand of the Garcia Suit from the Tenth Circuit, that AXA was aware that attorneys' fees and costs were reducing the available policy limits, and that PCC was exposed to a judgment in excess of the available limits, and nevertheless acted unreasonably with regard to settlement of the case. The jury is entitled to consider this evidence. Moreover, AXA's contention that it relied on the advice of counsel in determining the amount of

settlement authority to grant in the Garcia Suit, while relevant to the reasonableness of its conduct, is not an absolute defense to PCC's bad faith claim. Construing the factual disputes and inferences in favor of PCC, I find that material facts are in dispute and that summary judgment is inappropriate.

### 3. Liquidated Damages

I also reject AXA's contention that it is entitled partial summary judgment in its favor on what it characterizes as "PCC's claim to recover the amount of liquidated damages awarded to Garcia."[1] AXA maintains that even if PCC could establish bad faith, it cannot recover indemnity for the $256,362 awarded to Garcia as liquidated damages under the ADEA.

As discussed above, it is unclear whether Colorado public policy precludes coverage of an award of liquidated damages in a ADEA case. Moreover, AXA's argument is based on its assumption that the $256,362 awarded to Garcia as liquidated damages under the ADEA was covered by the portion of the settlement paid by PCC, and not the portion paid by AXA. There is no evidence in the record before me to support this assumption. AXA voluntarily contributed its remaining policy limit in order to settle the Garcia Suit. There is no evidence in the record that at the time of settlement of the Garcia Suit either AXA or PCC specified whether their respective contributions represented the compensatory portion of the judgment, the attorneys' fees portion of the judgment, the tax enhancement, or the liquidated damages portion of the

---

[1] AXA also asserts that PCC cannot recover its attorneys' fees incurred in prosecuting this action. Because PCC has made clear that it does not seek to recover those attorneys' fees, I need not address this argument.

judgment. Based on the record before me, I cannot grant partial summary judgment concerning the liquidated damages portion of the Judgment.

III.   CONCLUSION

In conclusion, I find that Plaintiff has demonstrated through its Response to Defendant's Motion for Summary Judgment, that there are genuine issues of material fact that preclude entry of summary judgment in this case. Therefore, it is hereby

ORDERED that Defendant's Motion for Summary Judgment, filed August 1, 2006 (docket #47) is **DENIED**.

Dated:  March 28, 2007

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge